UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RONALD E. FILSON                                    CIVIL ACTION

VERSUS                                              NO.  09-7451

TULANE UNIVERSITY, ET AL.                           SECTION  "N"  (4)

## ORDER AND REASONS

Before the Court is the Defendants' Motion for Summary Judgment (Rec. Doc. 39), filed by The Administrators of the Tulane Educational Fund, Kenneth Schwartz, and Michael Bernstein (collectively, "Defendants"). This motion is opposed, at least in part, by Plaintiff Ronald E. Filson ("Filson"). After considering the memoranda of the parties, the exhibits attached thereto, and the applicable law, the Court rules as set forth herein.

**I.     BACKGROUND**

Filson was hired by Tulane University ("Tulane") on July 1, 1980, wherein he served as Dean of the Tulane School of Architecture from 1980 to 1992. Beginning in 1992 and continuing until his retirement on June 30 2008, Filson served as a tenured professor. (Exhibit 5 to Rec. Doc. 39). After his retirement as a tenured professor, he was employed by the Tulane School of Architecture as an adjunct professor until June 17, 2009. (Exhibit 1 to Rec. Doc. 39, p. 49).

In April 2006 and in anticipation of his planned 2008 retirement, Filson entered into an agreement with then-Dean Reed Kroloff regarding teaching opportunities at Tulane after his planned retirement. (Exhibit 6 to Rec. Doc. 39). The agreement was to begin in the Fall 2008 semester and

continue until Spring 2010 or "until either of us believes the arrangement is not beneficial." *Id.*  In the letter, Dean Kroloff continued, "Should I remain as Dean beyond 2010, I will extend this agreement at least until 2012, as long as both of us still believes it is beneficial to all." *Id.*  In July 2008, Defendant Kenneth Schwartz became dean of the Tulane School of Architecture, replacing Dean Kroloff.

In 2007, Tulane began offering to architectural students a study abroad program in Rome, Italy ("the Rome Program").  In 2007 and 2008, the Rome Program was taught by two adjunct professors: Filson, who was the director of the Rome Program, and Doug Harmon.  However, in 2009 Dean Schwartz named two tenured-track faculty for the Rome Program.[1]  After learning of Dean Schwartz's decision, Filson was not happy.  During a meeting with Dean Schwartz, Filson called the dean "stupid" and told him that he had "no balls."  (Exhibit 1 to Dec. Doc. 39, p. 218; Exhibit 3 to Rec. Doc. 39, pp. 93-95)  Filson also sent an open letter to the faculty calling Dean Schwartz a "small minded, visionless, petty bureaucrat with absolutely no leadership skills." (Exhibit 1 to Rec. Doc. 39, p. 161; Exhibit 7 to Rec. Doc. 39). Further, Filson sent a letter to certain students, wherein he essentially challenged Dean Schwartz's leadership.[2]  (Exhibit 8 to Rec. Doc. 39).  After he was no longer involved, Filson attempted to harm the Rome Program by suggesting that a colleague falsely tell Dean Schwartz that there was "no space available" at a Rome location when space was actually available.  (Exhibit 2 to Rec. Doc. 39, pp. 49-50)  Filson also admitted to

---

[1]     Dean Schwartz testified that he desired to use the Rome Program as an academic development opportunity for full-time (tenured) faculty. (Exhibit 3 to Rec. Doc. 39, pp. 28, 44-45). He also testified that he was concerned about the budget if the Rome Program continued to utilize adjunct faculty. (Id. at pp. 28, 38, 41).

[2]     The letter advised the students that certain changes made by Dean Schwartz may "weaken and undermine the [Rome] program" and stated that "[f]or a new dean to ignore the intentions of what has been successful program demonstrates a lack of concern for academic quality and a willingness to compromise important parts of the student experience." (Exhibit 8 to Rec. Doc. 39).

telling a Tulane staff member, "Thanks and if you see the dean please tell him to go [f***] himself for me!" (Exhibit 1 to Rec. Doc. 39, pp. 246-47; Exhibit 14 to Rec. Doc. 39).  Filson also told a faculty member that Tulane was being visited by "the lowest, most petty and visionless leadership" by Dean Schwartz and Provost Dr. Bernstein (Exhibit 18 to Rec. Doc. 39). Additionally, Filson refused to vacate his office despite repeated requests by Dean Schwartz and Tulane (Exhibit 9 to Rec. Doc. 39, pp. 1317, 1446; Exhibit 13 to Rec. Doc. 39).  Dean Schwartz informed Filson that Tulane would no longer continue his role as an Adjunct Professor as of June 17, 2009. (Exhibit 3 to Rec. Doc. 39, pp. 90-94; Exhibit 4 to Rec. Doc. 39).

Filson filed this lawsuit on September 27, 2009. (Rec. Doc. 1-2).  His suit alleges nine claims against Defendants for: 1) age discrimination; 2) disability discrimination; 3) breach of contract; 4) detrimental reliance; 5) negligent misrepresentation; 6) defamation; 7) the taking of intellectual property; 8) a wage claim under the Louisiana Wage Payment Act; and 9) ERISA discrimination. (Rec. Doc. 1-2). Defendants moved for summary judgment on all claims.[3]

## II.   LAW AND ANALYSIS

### A.   Legal standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

---

[3]   In response, Plaintiff filed an opposition memorandum addressing only Plaintiff's breach of contract, detrimental reliance, wage claim, and defamation claims. (Rec. Doc. 44). Thus, Plaintiff has failed to address or provide opposition to Defendants' Motion for Summary Judgment with respect to his age discrimination, disability discrimination, negligent misrepresentation, intellectual property, or ERISA discrimination claims.  In the pre-trial conference, which occurred on December 17, 2010, Plaintiff's counsel confirmed that Plaintiff is no longer asserting such claims.  Accordingly, Plaintiff's claims of age discrimination, disability discrimination, negligent misrepresentation, intellectual property, and ERISA discrimination claims are dismissed as unopposed, with prejudice.  Moreover, the Court agrees with the substantive arguments made by Defendants in the instant motion which would also warrant dismissal of these claims.

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); see also *Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2553; see also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.*, 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana*, 294 F.3d 755, 758 (5th Cir.2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.*, 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence

4

of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." See *id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little*, 37 F.3d at 1075. Rather a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir.2002).

**B.      Analysis**

The Court will now address Plaintiff's four remaining claims: (1) the breach of contract claim; (2) the wage claim; (3) the defamation claim; and (4) the detrimental reliance claim.

**1.      Breach of Contract Claim**

Louisiana Civil Code Article 2046 provides a general rule of contract construction: "[w]hen

the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." A contract's words are interpreted using the "general prevailing meaning," and when words may have more than one meaning, the meaning that best comports with the contract's purpose applies. La. C. C. arts.2047, 2048. Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C. C. art. 2050. If the meaning of a provision is in doubt or is not easily ascertainable, the court looks to the contract's nature, equity, usages and the parties' conduct before and after the contract's formation. La. C. C. art. 2053.

Absent a specific contract or agreement establishing a fixed term of employment, an "at-will" employee is free to quit at any time without liability to his or her employer and, likewise, may be terminated by the employer at any time, provided the termination does not violate any statutory or constitutional provision. *Clark v. Acco Systems, Inc.*, 899 So.2d 783 (La.App. 2 Cir. 2005) (citing La. C.C. art. 2747). If the employment contract is an at-will agreement, an employee's termination need not be accurate, fair, or reasonable, and there does not have to be any reason at all for termination. *Id.* (citations omitted).

However, contracts must be performed in good faith. La. C. C. art.1983. An obligor in good faith is liable for the damages that were foreseeable at the time the contract was made. La. C. C. art. 1996. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La. C. C. art. 1997. In an employment contract, the obligation of good faith and fair dealing is breached where an agreement is violated "with a dishonest or morally questionable motive." *Barbe v. A.A. Harmon & Co.*, 705 So.2d 1210, 1220 (La.App. 4 Cir. 1998).

6

Here, Filson claims that Tulane failed to "honor its agreement to allow [him] to continue to direct the Rome Program until he reached his full retirement at the end of the spring semester in 2012 " and that Tulane breached its written and oral agreements with him.  (Rec. Doc. 1-2, ¶78).  Tulane, on the other hand, asserts that Filson was a tenured faculty member who voluntarily resigned and terminated his tenure as of June 30, 2008.  (Exhibit 5 to Rec. Doc. 39).  It notes that Filson signed an agreement with then-Dean Kroloff regarding post-retirement teaching opportunities as an adjunct professor. (Exhibit 6 to Rec. Doc. 39).  The April 1, 2006 agreement states:

> ...please consider the following agreement, which would commence with the fall, 2008 semester and remain in effect until Spring 2010, or until either of us believes the arrangement is not beneficial, whichever comes first.  Should I remain Dean beyond 2010 , I will extend this agreement at least until 2012, as long as both of us still believes it is beneficial to all.

(Exhibit 6 to Rec. Doc. 39). With respect to the Rome Program, the April 1, 2006 letter provides:

> In addition to the adjunct appointment for one semester of an academic year, we discussed the possibility of teaching as part of an architecture summer program in Rome, Italy, where you intend to live for part of the year.  In such a program, you would teach a portion of the courses along with the other Tulane faculty.

(*Id.*)   In a November 30, 2006 letter, then-Dean Kroloff advised Filson of his continued reappointment for the 2006-2007 academic year:

> Health, retirement, and all other benefits available to faculty will continue until your full retirement on June 30, 2008.  Subsequent to this date, we may choose to extend this agreement as described in my supplemental letter of agreement dates April 1, 2006."

(Exhibit 15 to Rec. Doc. 39). Defendants note, however, that there is no documentary evidence in the record that establishes that any such extension was later granted to Filson.

Further, Defendants argue that the language that the written agreement between Tulane and Filson would remain in effect until Spring 2010 or "until either of us believes the arrangement is not

beneficial" does not state that Filson was bound to remain in employment with Tulane until he had cause to leave, or that Tulane was bound to employ Filson until it had cause to terminate him.   In other words, Defendants contend that the "beneficial to all" language in the agreement is consistent with the general at-will employment relationship that employment may be terminated at any time by either party for any reason.[4]

Last, Defendants argue that even if this Court finds that Filson had a fixed term of employment until 2010 (or 2012), his misconduct, detailed on pages 2-3, *supra*, warranted his dismissal.   Thus, Defendants argue that the above-detailed misconduct validated and/or justified Tulane's decision to cease its relationship with Filson.

In opposition, Filson relies on a letter addressed to his counsel from Dean Kroloff, which further explains in hindsight the agreement  reached regarding Filson's continued employment. (Exhibit A to Rec. Doc. 44).[5]   On the showing made and based on the legally admissible evidence presently before this Court, the undersigned concludes that the agreement with Filson did not obligate Tulane prospectively to select Filson as Director of the Rome Program, nor did the

---

[4]      While Defendants note that the agreement states "[s]hould I remain Dean beyond 2010, I will extend this agreement at least until 2012, as long as both of us still believes it is beneficial to all." (Exhibit 6 to Rec. Doc. 39), they point out that Dean Kroloff did NOT remain as dean and was replaced by current Dean Schwartz on July 1, 2008.  Thus, Defendants claim that, because this suspensive condition never came into existence, Tulane was not obligated to perform as Filson alleges.

[5]      This letter is the subject of a related motion: Defendant's Motion to Strike Exhibit Submitted by Plaintiff in Opposition to Summary Judgment (Rec. Doc. 50). In the Motion, Defendants argue that this exhibit should be stricken by the Court on the grounds that it sets forth hearsay statements, it is unsworn and unauthenticated, and it is contradicted by sworn testimony.  Plaintiff opposes the motion, arguing that the exhibit is not the only exhibit that is not in affidavit form.  (See Rec. Doc. 55).  Plaintiff also has converted the statements made by Dean Kroloff  in the letter to an affidavit and has filed a motion seeking leave of Court to file that affidavit into the record. (See Rec. Doc. 54).  For substantially the same reasons as stated by Defendants, **Defendant's Motion to Strike Exhibit Submitted by Plaintiff in Opposition to Summary Judgment (Rec. Doc. 50)** is **GRANTED**, and the **Motion for Leave to File Dean Kroloff's Affidavit Into the Record of Filson's Opposition to Defendants' Motion for Summary Judgment (Rec. Doc. 54)** is **DENIED**.  Further, the Court finds that the agreement between Dean Kroloff and Filson is clear and explicit; thus, no further interpretation may be made in search of the parties' intent.

agreements obligate Tulane beyond then-Dean Kroloff's term as dean. Dean Kroloff was no longer dean of the Tulane School of Architecture in 2010 as Kenneth Schwartz had became Dean on July 1, 2008. (Exhibit 19 to Rec. Doc. 49, p. 30).  Filson himself has admitted that Dean Kroloff "could not make commitments beyond his term as Dean." (Exhibit 17 to Rec. Doc. 39). Thus, Dean Schwartz was under no obligation to continue Filson's employment as a adjunct faculty member. As for the allegation that Filson's employment as an adjunct faculty member should have continued to 2012, Filson has also conceded that the provost "would not allow" Dean Kroloff to state that the agreement extended  beyond 2010. (Exhibit 1 to Rec. Doc. 39, p.79).  Further, with respect to the Rome Program, the agreement only states that Filson and Dean Kroloff had "discussed the *possibility*" of Filson teaching in Rome. (Exhibit 17 to Rec. Doc. 39, emphasis added). "Possibilities" akin to speculation do not translate into binding contractual obligations.

Further and most importantly, the language that the written agreement between Tulane and Filson would remain in effect until Spring 2010 or "until either of us believes the arrangement is not beneficial" does not state that Filson was bound to remain in employment with Tulane until he had cause to leave or that Tulane was bound to employ Filson until it had cause to terminate him.  Thus, the Court concludes that this agreement constituted a general at-will employment relationship wherein such employment could be terminated at any time by either party for any reason.  Indeed, the agreement fails to establish a fixed term of employment.  Last, Tulane "does not insure continuity of appointment for any person in the adjunct faculty." (Exhibit 16 to Rec. Doc. 39, p. 456; Exhibit 1 to Rec. Doc. 39, pp. 224-25).

However, even had this Court determined that the agreement obligated Tulane to employ Filson until 2010 (or 2012), Tulane would still be entitled to summary judgment because it is

9

abundantly clear, based on the evidence before the Court, that Tulane terminated Filson's employment for cause. (See the aforementioned offensive comments and disruptive behavior detailed on pages 2-3, *supra*). Filson's numerous acts of misconduct, insubordination, contrary behavior, and insulting commentary clearly furnished good and just cause for his termination under Louisiana law. Insubordination and disrespectful conduct of an employee toward his employer is a sufficient ground for his discharge and the rescission of the contract of employment. *Railey v. Lanahan*, 34 La.Ann. 426, 1882 WL 8613 (La. 1882). It seems clear to this Court that Tulane and Dean Schwartz were justified in terminating the employment relationship with Filson, who was acting in an untoward manner (to say the least), making him undeserving of continued employment. Indeed, Plaintiff does not argue or assert that his misconduct did not provide just cause for his termination. Thus, Defendants are entitled to summary judgment on Plaintiff's breach of contract claim.

### 2.      Wage Claim under the Louisiana Wage Payment Act

Louisiana law requires employers to pay terminated employees "the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." La. R. S. §23:631. The Louisiana Wage Payment Act further provides that an employer who does not comply with the statute can be held liable for up to 90 days for penalty wages, or for full wages from the demand until payment, whichever is less. La. R. S. §23:632 *et seq*. In order to recover pursuant to La. R.S. §23:632, Filson must prove that "(1) wages were due and owing; (2) demand for payment was made where the employee was customarily paid; and (3) Tulane did not pay upon demand." *Becht v. Morgan Building & Spas, Inc.*, 843 So.2d 1109, 1112 (La. 2003).

In his Petition, Filson alleges a violation of La. R.S. §23:631 because Tulane "failed to pay" him. (Rec. Doc. 1-2, ¶94). Defendants note, however, that Filson's deposition testimony confirms that his wage claim is without merit.  When Filson was asked whether he was owed any wages from his initial date of employment in 1980 until his retirement in 2008, he responded, "I don't think so. It'd be great if I did, but, no, you know." (Exhibit 1 to Rec. Doc. 39, p. 176).  Further, when asked if he was owed any wages from the time he served as an adjunct professor in June 2008 until 2009, Filson responded, "I don't think so.  If you find any, please let me know."  (Exhibit 1 to rec. Doc. 39, p. 177). Last, when asked to identify any unpaid wages, Filson could not do so and, in fact, stated that there were no periods of time for which he was not paid. (Exhibit 1 to Rec. Doc. 39, p. 178).

In opposition, Filson asserts that he "would have received payment for his work as Director of the Rome Program by 31 July 2009, had defendants not breached their contract and fired him." (Rec. Doc. 44, p. 6 of 15).  To support his claim for penalty wages, Filson argues that Tulane owed him payment for wages arising from the work he contracted to perform as director of the Rome Program. He claims that those wages were due on July 31, 2009. Next, Filson contends that his counsel met with in-house counsel for Tulane on a number of occasions and made demand for such payment. Last, Filson asserts that Tulane never paid him said owed wages and never made a counter-offer to Filson's demand for such wages.  Essentially, while admitting that he was paid for the years he worked, Filson contends that he was not paid for the initial period of the contract under which he would have been paid had Tulane not purportedly breached that agreement.

Because this Court has found no breach of contract, Defendants are entitled to summary judgment on this claim.

### 3.     Defamation Claim

Defamation "involves the invasion of a person's interest in his or her reputation and good name." *Trentecosta v. Beck*, 703 So.2d 552, 559 (La.1997). To prevail on a defamation claim, a plaintiff must establish: (1) a false and defamatory statement, (2) publication to a third party, (3) falsity, (4) fault (negligence or greater, including actual malice), and (5) resulting injury. *Rouly v. Enserch Corp.*, 835 F.2d 1127, 1129 (5th Cir. 1988). "Language is defamatory when it tends to expose the plaintiff to contempt, hatred, ridicule or obloquy, or causes [him or her] to be shunned or avoided, or has a tendency to ... injure [him or her] in [his or her] occupation." *Martin v. Lincoln Gen'l Hosp.*, 588 So.2d 1329, 1332 (La.App. 2 Cir.1991), *writ denied*, 592 So.2d 1329 (La.1992).

If made in good faith, communications occurring as part of an employer's investigation of an employee's alleged wrongdoing are treated as not being a "publication," or as being subject to a qualified privilege. See, *e.g.*, *Sears, Roebuck, and Co., v. Danny Williams Plumbing Co.*, Civil Action No. 98-2882, 1999 WL 280439, *4 (E.D. La. 5/4/99); see also *Espree v. Tobacco Plus, Inc.*, 772 So.2d 389, 391-92 (La. App. 3 Cir. 2000); *Martin*, 588 So.2d at 1333-34. "Good faith" or a "lack of malice," in the context of defamation, means that the person making a statement honestly believes that it is true and has reasonable grounds for believing it to be true. *Rouly*, 835 F.2d at 1130; *Martin*, 588 So.2d at 1333.

Here, Filson alleges that Dean Schwartz and Dr. Bernstein have made "false and or mistaken statements concerning Filson, the nature and performance of and compensation for his professional educational services." (Rec. Doc. 1-2, ¶97).  Regarding the allegedly defamatory statements purportedly made by Dean Schwartz, Filson claims that Dean Schwartz said that "he saw his role as repairing all of the inadequacies and problems of past leadership of the school and -- and bringing

12

the school to, I guess, probably something like national prominence." (Exhibit 1 to Rec. Doc. 39, pp. 178-79).  Filson continued, "[w]e all say that as deans, but few people do it."  (Exhibit 1 to Rec. Doc. 39, p. 179).  Filson also claims that Dean Schwartz mentioned him by name and said that Tulane had been "a very kind of sleepy school for a number of years" and that  "The school had not had great leadership in a long time."  (Exhibit 1 to Rec. Doc. 39, pp. 184-85).   Filson admits that he was not present when these comments were allegedly made and that he has no first-hand knowledge of the alleged remarks.  (Exhibit to Rec. Doc. 39, pp, 183, 274).  Further, Filson argues that the mere act of Dean Schwartz terminating him was "absolutely defamatory."  (Exhibit 2 to Rec. Doc. 39, p. 86).

As for the allegedly defamatory statements purportedly made by Dr. Bernstein, Filson asserts that in a meeting with Dean Schwartz, Dr. Berstein and himself, Dr. Bernstein commented that Filson had been "highly overcompensated."  (Exhibit 1 to Rec. Doc. 39, p. 188).  Filson asserts that this statement was defamatory because it implied that his work was not worth what he was paid. (Exhibit 1 to Rec. Doc. 39, pp. 188-89).  Filson further claims that Dr. Bernstein defamed him when he went "almost berserk" during a telephone call [between only he and Filson], where he told Filson not to abuse one of his deans and threatened to have Filson escorted off campus by the campus police. (Exhibit 2 to Rec. Doc. 39, p. 87).

First, Defendants respond that many of Filson's defamation allegation cannot survive summary judgment because they constitute inadmissible hearsay.  For instance, with respect to the alleged statements made by Dean Schwartz, Defendants note that these are statements allegedly told to Filson by others.  Even if Filson could overcome such a hearsay objection, Defendants argue that summary judgment is appropriate because Filson has made an unmeritorious defamation claim that

threatens the exercise of First Amendment rights. Defendants note that while Filson complains about remarks allegedly made by Dean Schwartz, Filson has testified that the remarks he made to and about Dean Schwartz calling him "vindictive", "petty" and "stupid" and having "no balls" were, on the other hand, actually appropriate. (Exhibit 1 to Rec. Doc. 39, pp. 107-08, 146, 218; Exhibit 2 to Rec. Doc. 39, pp. 81, 103, 116). Further, Defendants argue that even if Dean Schwartz had made these statements, such statements are "opinions" and do not constitute defamation.[6] Defendants note that courts have recognized that "the First Amendment freedoms afford, at the very least, a defense against defamation actions for expressions of opinion." *Greene v. Louisiana ex rel. Dep't of Corr.*, 08-2360 (La. App. 1 Cir. 6/19/09), 21 SO. 3D 348, 351-52. Further, as for the statements allegedly made by Dr. Bernstein to Filson while only he and Filson were on the telephone, such statements do not constitute defamation as there was no publication to a third party. Last, Defendants contend that the fact that Filson was terminated cannot be defamatory as it was an action - not words.  They also note that to the extent that Filson claims his "termination" was communicated to others, that statement would not be defamatory because it was true (i.e., his continued employment with Tulane was terminated).

In opposition, Filson asserts [without citing any case law to support his position] that Dean Schwartz's firing of him is the type of non-verbal conduct which under federal and state law can constitute a defamatory statement. Filson complains that Schwartz evicted him from the office he had occupied in the Architecture Building for years and announced that Filson would be placed in another building away from the main building.  This "office eviction", Filson writes, is "[t]he reward for thirty years of distinguished service to Tulane University. A parting gift to an Emeritus

---

[6]     Filson agreed that these statements were opinions.  (Exhibit 1 to Rec. Doc. 39, pp. 186, 188).

14

Professor." (Rec. Doc. 44, p. 7 of 15). Filson asserts that Dean Schwartz's non-verbal acts against him compound his defamatory statements. Filson argues that Defendants' comments about him as well as their conduct in firing him and publically evicting him from his office of many years, constitutes defamation under Louisiana law.

Filson also argues that none of the comments made by Schwartz are hearsay because Filson is not offering them to prove the truth of the matter asserted. Instead, Filson claims that he is offering these statements to prove that Dean Schwartz defamed him (and other deans and professors as well). In other words, Filson is not offering them to prove that Dean Schwartz's defamatory statements were factually true. Further, Filson claims that an out of court statement can be admitted for any purpose other than showing that it is true, so long as that purpose is relevant and not barred by another rule of evidence. Filson asserts:

> Having struggled through parts of Ayn Rand's damning view of the world of architecture, *The Fountainhead*, one might expect an occasional reincarnation of Howard Roark with his inevitable struggles between Peter Keating and the "second-handers" bound by tradition-worship. Fortunately there is no Ellsworth Toohey in this litigation and even Schwartz's criticism of Filson and the past deans does not rise [or sink] to Toohey's level of criticism. But Louisiana's law of defamation does not require a plaintiff to prove a [sic] Toohey's malice or his intent. Schwartz's defamation of Filson and the former deans is "negligent" "if not greater".

(Rec. Doc. 44, p. 10 of 15). Filson further argues, "[o]thers and Filson will testify as to what Schwartz said about the former deans and professors and the School of Architecture itself. Their testimony is not hearsay and should be considered by the Court as finder of fact." (Rec. Doc. 44, p. 13 of 15).

The Court concludes that Plaintiff has offered no evidence, deposition testimony, sworn (or unsworn) testimony from any witness with personal, firsthand knowledge of the alleged facts to

support his defamation claim.  Indeed, Filson has offered only his testimony about what other persons told him that Dean Schwartz said and about what a colleague heard from a third party about what the third party heard Dean Schwartz say. For example, Filson testified:

> Q. You said he [Dean Schwartz] sat on some reviews. Is that where he allegedly made the negative comments about the leadership?
>
> A: That's what I was – yeah, that's what I was told.
>
> Q: And you heard this from whom?
>
> A: Through – through Robert Gonzales, who spoke with Casey Jones, who is Reed [Kroloff]'s partner.
>
> Q: And you have no firsthand knowledge of this?
>
> A: I'm just saying, I'm just telling you things that were mentioned to me.

(Exhibit 1 to Rec. Doc. 39, p. 274). Filson also alleges that, in addition to him, "others" will testify as to what Dean Schwartz said. (Rec. Doc. 44, p. 13 of 15).  However, on the showing made, Filson has failed to point to summary judgment-type evidence in the record at this time to support his claim for defamation. An assertion about what a witness (or witnesses) *may* testify to in the future is insufficient to survive a summary judgment motion. Filson has provided no firsthand evidence (in the form of an affidavit, deposition transcript, or otherwise) to support of his defamation claim.

Moreover, *even if* this Court were to consider the statements allegedly said by Dean Schwartz and Dr. Bernstein, heard by others, and then reported to Filson[7], summary judgment on this

---

[7]     Again, Filson has alleged that: (1) Dean Schwartz said Tulane was a "very sleepy school" and "had not had great leadership in a long time" (Exhibit 1 to Rec. Doc. 39, pp. 184-85); (2) Dean Schwartz saw his role as "repairing all of the inadequacies and problems of past leadership of the school" and bringing the school to national prominence (Exhibit 1 to rec. Doc. 39, p. 179); (3) Dr. Bernstein went "almost berserk" in a meeting with Filson and threatened to have Filson removed from campus by security if Filson continued being abusive (Exhibit 2 to Rec. Doc. 39, p. 87) ; (4) Dr. Bernstein told Filson that he was "highly overcompensated" for his work (Exhibit 1 to rec. Doc. 39, p. 188); and (5) Dean Schwartz terminated Filson and evicted him from his office (Rec. Doc. 44, p. 7 of 15).

defamation claim is still appropriate.  While Filson cites *Munson v. Gaylord Broad. Co.*, 491 So. 2d 780, 782 (La. App. 4 Cir. 1986), for the principle that "[o]ne cannot falsely accuse another of some grave misdeed such as murder or prostitution without being at fault in some way […]", the Court agrees with Defendants that Plaintiff's reliance on *Munson* is misplaced.  Filson has not alleged that Defendants have accused him of a crime or made statements that would be defamatory *per se*.  There are no similarities between the comments discussed in *Munson* and the comments at issue here. This Court concludes that the statements allegedly made by Dean Schwartz and Dr. Bernstein do not rise to the level that they should be removed from First Amendment protection. See *Jalou II, Inc. v. Liner*, 10-0048 (La. App. 1 Cir. 6/16/10); 2010 WL 2400431, at *6 (holding that "[b]ecause of their chilling effect on the exercise of freedom of speech, defamation actions have been found particularly susceptible to summary judgment").

Further, the Court agrees with Defendants that the alleged statements attributed to Defendants were opinions.[8]  "First Amendment freedoms afford, at the very least, a defense against defamation actions for expressions of opinion." *Greene*, 21 So. 3d 348, 351-52.  Last, the Court notes that while Filson alleges that his termination was a defamatory act, he cites no law or authority for this proposition, nor does he explain how the act was published or how the act was "false." See *Huxen v. Villasenor*, 01-288 (La. App. 5 Cir. 9/25/01); 798 So. 2d 209, 212 (listing publication and falsity of the communication as elements of a defamation claim). Similarly, Filson has offered no evidence or testimony that Defendants published the fact that he was asked to move from one office to another.  However, there is evidence in the record that Filson himself made this information public

---

[8]        Indeed, even Filson himself confirmed in his deposition that he believed that these statements were opinions. (Exhibit 1 to Rec. Doc. 39, pp. 186, 188).

by creating an "Eviction Sale" flyer, and sending it to "[a]ll the people in the school," and posting it at Tulane. (Exhibit 1 to Rec. Doc. 39, pp. 241-42; Exhibit 13 to Rec. Doc. 39). Last, the meeting in which Filson alleges that Dr. Bernstein went "almost beserk" cannot be defamatory because only Filson and Dr. Bernstein participated on this telephone conference. ( Exhibit 2 to Rec. Doc. 39, p. 87). Thus, there was no communication to a third party as required under a defamation law.  For all of these reasons, this Court concludes that summary judgment should be granted on Filson's defamation claim.

### 4.    Detrimental Reliance Claim

Louisiana law defines claims for detrimental reliance in Louisiana Civil Code article 1967:

> [a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

La. C. C. art. 1967. To make out a case for detrimental reliance, Filson must establish: (1) a representation by word or conduct; (2) justifiable/reasonable reliance on that representation; and (3) a change in position to his detriment because of the reliance. See *Lakeland Anesthesia v. United Healthcare of La.*, 03-1162 (La. App. 4 Cir. 3/17/04), 871 So.2d 380, 393.

Here, Defendants note that Filson was expressly told by Dean Kroloff that he could not state that the agreement extended beyond 2010. (Exhibit 1 to rec. Doc. 39, pp. 78-80).  He was also told by Dean Kroloff that he could not make commitments beyond his term as Dean. (Exhibit 17 to Rec. Doc. 39). Further, Defendants argue that Filson's acts of misconduct served as intervening acts that warranted his dismissal.  Defendants contend, "[a] belief by Filson that he was free to act with impunity and free to use abusive, demeaning, and insulting language to the Dean without

18

repercussion was not a reasonable or justifiable belief."  (Rec. Doc. 39-2, p. 23 of 26).

In opposition, Filson asserts that while he retired as a tenured professor on June 30, 2008 (Exhibit 5 to Rec. Doc. 39), he did so  with the express understanding and agreement that he would continue to direct the Rome Program and not fully retire until 2012. Filson asserts that he would not have given up his tenured status otherwise.  Filson argues that Dean Kroloff's agreement with him constituted a meeting of the minds, and as such, an oral agreement as to Filson continuing as Director of the Rome Program and teaching at the School until 2012; and in exchange, Filson would give up his tenure status and reduce the amount of his pay. Under that agreement , Filson asserts that he  should have been paid his Rome salary for 2009 on or before July 31, 2009; however, he was not. He claims that he relied on the agreement with Dean Kroloff on behalf of the University and kept his part of that promise (i.e., he retired his tenure status).  Filson contends that Dean Schwartz and Dr. Bernstein breached the agreement, removed him from the Rome program, then fired him the following semester. (Rec. Doc. 1-2, ¶¶ 41, 43, 47, 53, 57).  Filson states that he "can and with the testimony of several other witnesses will prove that beginning with Dean Kroloff and continuing until the arrival of Dean Schwartz with the assistance of Provost Bernstein, the architecture deans, faculty, and students all understood that Filson would continue to conduct the Rome Program and teach on campus in New Orleans until his full retirement in 2012." (Rec. Doc. 44, p. 4 of 15). Filson asserts that certain oral agreements were presented to him and caused him to give up his tenure status and become an adjunct professor; Filson contends that he relied those oral agreements to his detriment.

Filson asserts that he "*will prove* that Tulane through deans Kroloff and Bernard created (1) representations that he relied on by their conduct and their words, and that based on their conduct

(2) his reliance was justifiable. And it is evident from the defendants' subsequent acts that (3) Tulane changed its position and that change was to his detriment and the cause-in-fact of his damages." (Rec. Doc. 44, pp. 5-6 of 15). Filson asserts that his reliance on Dean Kroloff's offer took place in 2008, before Dean Schwartz became dean. Filson reiterates that he would not have given up his tenure status nor would he have agreed to become an adjunct professor and risk being fired, had he not relied on the former dean's proposal and understood that he would continue as in Rome and working on campus until 2012. (Rec. Doc. 44, p. 6 of 15).

This Court concludes that Filson's claim for detrimental reliance cannot survive summary judgment. While Filson claims that others will testify to certain oral agreements which were allegedly made and which he allegedly relied on to his detriment, Filson has put forth no such "evidence" before the Court. While Filson contends that the motive for his retirement from full-time status was his belief that he would direct the Rome Program until 2012 (Rec. Doc. 44, p. 3), the Court has before it the actual written agreements, which for the reasons outlined herein, do not justify this seemingly distorted belief. Had this been so important to Filson, surely he would have secured its incorporation into the actual agreement. Instead, the agreements state to the contrary. Filson has admitted that he was told by Dean Kroloff that he could not state that the agreement extended beyond 2010. (Exhibit 1 to Rec. Doc. 39, pp. 78-80). Filson has also admitted that the provost "would not allow" Dean Kroloff to state that the agreement extended beyond 2010. (Exhibit 1 to Rec. Doc. 39, p.79). Filson was also told by Dean Kroloff that he could not make commitments beyond his term as Dean. (Exhibit 17 to Rec. Doc. 39). Last, with respect to the Rome Program, the agreement only states that Filson and Dean Kroloff had "discussed the *possibility*" of Filson teaching in Rome. (Exhibit 17 to Rec. Doc. 39, emphasis added).

Moreover and perhaps most importantly, even if Filson *had* justifiably relied on continued employment until 2012, he could not have justifiably believed that he could carry out his employment while engaging in abusive, demeaning, and insulting language and conduct toward Dean Schwartz and be immune from any recourse in so doing. To the extent that Filson believed any purported employment agreement (whether written or oral) allowed or licensed him to act so inappropriately, that belief was not reasonable or justified. Thus, the Court will grant summary judgment to the Defendants on Miller's claim for detrimental reliance.

## III.    CONCLUSION

Considering the foregoing, **IT IS ORDERED** that **Defendants' Motion for Summary Judgment (Rec. Doc. 39)** is **GRANTED** in its entirety.

Further, as noted in note 5, *supra*, **IT IS FURTHER ORDERED** that **Defendant's Motion to Strike Exhibit Submitted by Plaintiff in Opposition to Summary Judgment (Rec. Doc. 50)** is **GRANTED**, and the **Motion for Leave to File Dean Kroloff's Affidavit Into the Record of Filson's Opposition to Defendants' Motion for Summary Judgment (Rec. Doc. 54)** is **DENIED**.

New Orleans, Louisiana, this 29th day of December 2009.

                          _____
                          KURT D. ENGELHARDT
                          United States District Judge